UNITED STATES of America, Plaintiff,

v.

**Timothy W. HEIR, Defendant.**

No. 4:99CR3026.

United States District Court, D. Nebraska.

Aug. 1, 2000.

---

John C. Brink, Minneapolis, MN, for Timothy W. Heir, defendant.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 53) and the objections to the Report and Recommendation filed by Defendant (filing 54) and Plaintiff (filing 55). Pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, I have conducted a de novo review of the portions of the Report and Recommendation to which objections have been made.

I find that inasmuch as Judge Piester has fully, carefully, and correctly found the facts and applied the law, the Report and Recommendation (filing 53) should be adopted, the parties' objections (filings 54,

55) should be denied, and Defendant's motion to suppress (filing 11) should be granted. I will briefly comment on my reasons for such findings.

## I. Defendant's Objections

Defendant, Timothy W. Heir ("Heir"), objects to Magistrate Judge Piester's conclusion that Trooper Duis had a reasonable, articulable suspicion for continuing to detain Defendant after completing the traffic stop (see Report and Recommendation pp. 6–7), and to his assumption that Robbie was a "well-trained narcotics detection dog" (see Report and Recommendation pp. 7–12).

### A. Continued Detention

■ Heir argues that the facts of this case are indistinguishable from those presented in *United States v. Beck*, 140 F.3d 1129 (8th Cir.1998). I disagree. The distinguishing facts are that Heir's explanation for his travel by car from California to Minnesota was inherently suspicious, and that Heir's behavior changed markedly after the radio dispatch came in regarding his criminal history. Heir had a California driver's license and was driving a vehicle which he rented from the Los Angeles airport. He told Trooper Duis that he had flown to California from Minnesota, where he now lived, to check on some pet damage to a carpet in a rental property that he owned. He said that he was driving back to Minnesota because he did not like to fly. Heir was relaxed during this conversation, which took place in the patrol car. His demeanor changed as soon as Trooper Duis asked if he had been arrested before. Heir nervously stated that he had an old arrest for DUI. His nervousness increased when the radio dispatch indicated that Heir's record contained a bribery conviction and a charge of transporting narcotics. He fidgeted in the seat, was breathing hard, and became inattentive to Trooper Duis' questions. As noted by Magistrate Judge Piester, this is a close question, but I agree with his conclusion that Trooper Duis was acting upon a reasonable, articulable suspicion rather than a mere hunch when he detained Heir

for the purpose of conducting the canine sniff of the exterior of the vehicle. *Compare United States v. Kirkpatrick*, 5 F.Supp.2d 1045 (D.Neb.1998).

Furthermore, the evidence in this case establishes that the detention was quite brief. After completing the traffic stop and issuing Heir a warning ticket for crossing the yellow shoulder line and following too closely, Trooper Duis informed Heir that he was free to go but that Duis would like to ask him a few more questions. Heir agreed and stayed in the patrol car. Duis asked Heir if he had any drugs in the car. Heir looked at the car and shook his head. Duis asked if he could search the car. Heir said, "No." Duis then informed Heir that he would be detained while Duis walked his dog, Robbie, around the car. Duis had Heir stand by the front passenger side of the patrol car while he got Robbie out of the back seat. He walked Robbie around Heir's rented vehicle three times in a span of about ninety seconds. He then informed Heir that Robbie had detected the odor of drugs coming from the vehicle and that Duis was going to conduct a search. After a search of the trunk revealed what appeared to be controlled substances, Heir was placed under arrest.

■ In *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643 (8th Cir. 1999), *cert. denied, Alexander v. United States*, —— U.S. ——, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000), the Court of Appeals held that a two-minute canine sniff of the exterior of a vehicle following a traffic stop was not an unreasonable detention, and, because it was not a search, did not require that the officer have reasonable suspicion that criminal activity was afoot. As stated by the Court: "[W]hen a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure, it does not violate the Fourth Amendment to require that the offending motorist's detention be momentarily extended for a canine sniff of the vehicle's

exterior." *Id.* at 649. This decision is controlling here and requires a finding that the canine sniff was not unconstitutional.

### B. Canine's Training

Magistrate Judge Piester assumed, without deciding, that Robbie was a "well-trained narcotics detection dog." Heir challenges this assumption and contends that the records of Robbie's deployments show that he was demonstrably wrong 41% of the time. The government counters by stating that the same records demonstrate that Robbie had a 92% accuracy rating. Because I agree with Magistrate Judge Piester's determination that the canine sniff did not provide probable cause for the search, I also find it unnecessary to assess Robbie's qualifications.

### II. Plaintiff's Objections

The government objects to the Report and Recommendation insofar as it concludes that there was not probable cause for the search and that any evidence and statements obtained as a result of the search should be suppressed. It specifically objects to Magistrate Judge Piester's statement that the dog merely showed an "interest" in the vehicle, to his reliance upon the testimony of Defendants' experts as opposed to Plaintiff's experts, and to his conclusion that "alert" behavior by a canine, as opposed to a positive "indication" of drugs, is insufficient to support a finding of probable cause.

### A. Lack of Probable Cause

■ After reviewing the extensive testimony that was presented to Magistrate Judge Piester and watching the videotape of the canine sniff (Exhibit 101), I agree with his determination that dog's actions did not positively signal the presence of drugs inside the vehicle. Trooper Duis testified that in this case Robbie "alerted" to the presence of drugs by sniffing more intensely around certain areas of the car, but he acknowledged that such "alert" be-

havior was subtle and might only be recognized by himself or another person who was familiar with Robbie's tendencies. Although Robbie was trained to "indicate" (by scratching) when he located the strongest source of the drug odor, he did not do so in this case. Defendants' experts testified that the "alert" behavior described by Trooper Duis could easily be attributed to his "cuing" of the animal, either intentionally or unintentionally, by changing the leash from one hand to the other, by stopping, by blocking the way, or by other actions. They saw nothing on the videotape to indicate that Robbie had detected the presence of drugs.

As further found by Magistrate Judge Piester, even if the "alert" behavior described by Trooper Duis had in fact occurred, this is too subjective a standard to establish probable cause. I agree that there must be an objectively observable "indication" by the dog of the presence of drugs. *See United States v. Jacobs,* 986 F.2d 1231 (8th Cir.1993) (warrant affidavit stating that drug sniffing dog had displayed interest in package, without disclosing that no "alert"[1] had occurred, rendered warrant invalid). Because it is undisputed that Robbie did not positively "indicate" the presence of drugs in the vehicle, as he was trained to do, there was no probable cause for the search.

### B. Suppression of Evidence

■ Finally, the government objects that a hearing should be conducted pursuant to 18 U.S.C. § 3501 to determine the voluntariness of Heir's post-arrest confession. It appears from the motion to suppress that Heir's statement was taken at the Grand Island State Patrol Office shortly after his arrest, and while the vehicle was being further searched. Under these circumstances, it is clear that any confession by Heir was the product of the illegal search and unlawful arrest, and that the statement must be suppressed. *See Wong*

---

1. As discussed in the Report and Recommendation, in *Jacobs* and most other reported decisions the term "alert" is used in the same manner as "indication" is used by the Nebraska State Patrol.

*Sun v. United States,* 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Accordingly,

IT IS ORDERED:

1. the Magistrate Judge's Report and Recommendation (filing 53) is adopted;

2. Defendant's objections to the Report and Recommendation (filing 54) are denied;

3. Plaintiff's objections to the Report and Recommendation (filing 55) are denied; and

4. Defendant's motion to suppress (filing 11) is granted.

**REPORT AND RECOMMENDATION**

PIESTER, United States Magistrate Judge.

On March 17, 1999 a grand jury indicted the defendant Timothy W. Heir on one count of knowing and intentional possession with intent to distribute cocaine, a Schedule II controlled substance, and one count of knowing and intentional possession with intent to distribute marijuana, a Schedule I controlled substance, both in violation of 18 U.S.C. §§ 841(a)(1). Filing 1. Defendant has filed a motion to suppress, filing 11, in which he articulates four arguments in support of his contention that this court should suppress the evidence found in his rental vehicle and the statements he made after his arrest.

Defendant first argues that on February 19, 1999, Nebraska State Patrol Trooper Andrew J. Duis unlawfully stopped defendant's rental vehicle without reasonable suspicion or probable cause.

Secondly, defendant contends that even assuming the stop was lawful, Trooper Duis' detention of defendant was of unconstitutional duration.

Next, defendant argues that the search of defendant's rental vehicle was not supported by probable cause.

Finally, defendant contends that any statements he made were involuntary and were the fruits of the illegal stop and search of his vehicle.

On August 24, 1999 a hearing was held before me on the motion. Due to several procedural delays, the hearing was then continued to March 30, 2000. For the reasons set forth below, I conclude the following: Trooper Duis did have probable cause to stop defendant's vehicle; Duis had reasonable suspicion to continue defendant's detention; the behavior manifested by the dog during the exterior sniff of the vehicle did not give Duis probable cause for a search; and any statements made by defendant during his custodial arrest should be suppressed as fruits of the illegal search of the vehicle. Accordingly, I shall recommend that defendant's motion be granted.

**BACKGROUND**

Nebraska State Trooper Andrew Duis was on duty on February 19, 1999, on interstate 80 close to the 311 marker. At approximately 2:30 p.m. he observed a Blue Buick Century traveling eastbound crossing the inside yellow shoulder line of the highway. Based on his experience, this driving behavior often indicated either intoxication or that the driver has been driving for a long time and was tired. Thus, Duis decided to follow the vehicle. While following the vehicle, he observed that the vehicle was following a semi-trailer too closely. Duis stated that the vehicle was following the trailer at a ½ second distance, which is significantly closer than the State of Nebraska's 2–second minimum distance rule. At this time, Duis decided to flash his red lights to stop the defendant. This took place in Hamilton County, Nebraska.

Once the vehicle stopped, Duis approached the driver, later identified as Timothy W. Heir, the defendant, and asked for his driver's license and documents. Defendant produced a valid California driver's license and a rental agreement showing he had rented the car in Los Angeles, California. While standing outside the vehicle Duis observed a number of things. He noticed a large box with cas-

sette tapes and junk food boxes in the back of the car. Duis also observed a sports cap in the back window, something he thought was unusual since it is rare that someone would go through the effort of personalizing a rental car. Eventually, Duis directed the defendant to his patrol vehicle, where he explained to him the reasons for the stop and told him he was going to write him a warning ticket for crossing the yellow shoulder line and following too closely.

While running the driver's license and criminal history checks, Duis proceeded to ask the defendant questions about his travel. Defendant stated he was traveling to Minnesota, which is his state of residence. Duis then asked the defendant why he had a California operator's license. Defendant explained that although he now lives in Minnesota, he still had a California driver's license because he lived there previously and still owned rental property in that state. Duis then inquired about the purpose of defendant's trip to California and how he had gotten there since the car had been rented at the Los Angeles Airport. Defendant stated that he had flown there to examine damage to carpet in one of his rental properties that had been caused by a renter's pet. He also explained that he had decided to drive back to Minnesota because he did not like flying. Duis stated that the defendant was relaxed during this conversation.

Duis received information from the dispatcher that the driver's license was valid and some vague information that the defendant had a criminal history. He decided to ask the defendant about whether he had been arrested before. It was then that, according to Duis, defendant's demeanor changed and became nervous. He explained that the defendant's response was slow, that his voice deepened, and that he began to move around. Defendant mentioned an old arrest for a DUI but nothing more. At this point, Duis was informed by the dispatcher that the defendant's criminal history had codes that represented a bribery conviction and a charge for transporting narcotics. Duis did not talk to the defendant about this information. The defendant's demeanor had, however, become increasingly nervous by this time, according to Duis.

After completing the warnings, Duis told the defendant he was free to go, but asked him if he would respond to a couple of questions. Defendant asked whether he was free to go. Duis repeated that he could leave, but that he wanted to ask him more questions. The defendant said "OK" and stayed in the squad car. Duis proceeded to ask him whether there were any drugs in the car. Defendant looked at he car and shook his head responding that he was not carrying any drugs. Duis then asked him if he could search the car. Defendant answered "No." Trooper Duis then told defendant that he was going to walk around the vehicle with his dog, "Robbie." The dog had been inside Duis' vehicle during the questioning of the defendant, and Duis admitted that it had not been agitated at all during these events.

Before he began his walk, Duis asked the defendant to come out of his vehicle and to wait by the passenger front side tire for safety purposes. Duis and Robbie then circled the defendant's car about three times. Duis stated that the behavior manifested by Robbie was an "alert" to the presence of drugs, thus, giving him probable cause to search the vehicle.

Duis returned Robbie to the patrol vehicle and explained to defendant that the dog had detected the odor of drugs coming from the rental vehicle. He asked defendant whether the vehicle had been in his possession since he rented it, and whether he had any luggage inside the car. Defendant answered "Yes" to both questions. Duis then asked defendant whether he would be responsible for anything found in the trunk of the car. Defendant answered "No." Eventually, Duis told defendant he was going to search the car.

After taking the keys from the ignition, Duis opened the trunk of the vehicle. There he found several large nylon suitcase bags. He opened one of them and

the first thing he noticed was a strong odor of dryer sheets. Inside the suitcase he observed a brown trash bag and within it a number of large bricks wrapped in plastic. Based on his training and experience, Duis believed these bricks contained controlled substances and immediately placed the defendant under arrest. Defendant was transported to the Nebraska State Patrol station in Grand Island. Once they arrived there, the search of the vehicle was continued and one pound of cocaine and three twenty-pound bundles of marijuana were recovered.

## DISCUSSION

### (1) LAWFULNESS OF TRAFFIC STOP

 Defendant first argues that his traffic stop violated his Fourth Amendment rights because Duis did not have either probable cause or reasonable suspicion to conduct it. I disagree. The traffic stop of defendant's vehicle was permissible. Driving the vehicle onto the shoulder area and following another vehicle by less than two seconds provided the basis for Duis to stop the defendant, pursuant to NEB.REV.STAT.ANN. § 60-6, 140 and 142. Such moving violations provide probable cause for a traffic stop. *See United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993) ("It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." (citations omitted)). Although a traffic stop may not be pretextual, "[i]f the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir.1994); *see United States v. Cummins*, 920 F.2d 498, 501 (8th Cir.1990). I therefore reject defendant's first argument.

### (2) CONTINUED DETENTION

 Defendant's next argument is that Duis did not have reasonable suspicion to justify his continued detention following the conclusion of the traffic stop, and thus all evidence seized from their vehicle must be suppressed. "Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994) (citing *Barahona*, 990 F.2d at 416; *United States v. Richards*, 967 F.2d 1189, 1192–93 (8th Cir.1992)). Further inquiry, however, is limited: "An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and continue to detain the person for additional investigation." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir.1997).

Although it is a close question, I conclude that the facts gathered by Duis during the initial investigation of the stop were enough to give him a reasonable, articulable suspicion that criminal activity was afoot. *See Terry v. Ohio*, 392 U.S. 1, 25–31, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). First, Duis thought it was highly unusual that defendant had flown to California only to examine damage to a carpet caused by a renter's pet in one his properties. Second, Duis received information from dispatch that defendant had been convicted of bribery and transportation of narcotics in the past. Duis became especially suspicious because earlier he had inquired from defendant about his past history and he had failed to mention those convictions. Finally, Duis testified that the defendant appeared to become increasingly nervous. He stated that the defendant started fidgeting in his seat, that he began to breath harder, and that he became inattentive. *See United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994) ("A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity that further inquiry is appropriate."). Accordingly, I reject defendant's second argument.

### (3) SEARCH BY THE DOG

Defendant also argues that the behavior manifested by "Robbie" during the "walk-around" did not provide probable cause supporting Duis' full-blown search of the vehicle. I agree.

The identification of drugs by a dog provides probable cause that drugs are present. *United States v. Bloomfield,* 40 F.3d 910, 919 (8th Cir.1994) (citing *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)); *United States v. Stone,* 866 F.2d 359, 363 (10th Cir.1989). This, however, is premised on the assumption that the dog is a "well-trained narcotics detection dog." *See Place, supra.* Once probable cause is established, a car can be searched without a warrant under the automobile exception to the warrant requirement. *Bloomfield, supra* (citing *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)).

Assuming in this case that Robbie was in fact a "well-trained narcotics detection dog,"[1] I still conclude that the behavior the dog manifested while circling defendant's vehicle was not a sufficient indicator of the presence of drugs to amount to probable cause. During his testimony, Duis described Robbie as an "aggressive indicator" and stated that the dog's behavior when he detects the presence of drugs is to become agitated and scratch at the strongest source of the odor. The videotape of the stop showed, however, that Robbie only stopped and sniffed around the rear license plate, the rear wheel well, and put his paws on the rear bumper of the vehicle. At no time during the "walk-around" did Robbie exhibit the specific reaction described by Duis that would positively signal he had detected the presence of drugs inside the vehicle.

Duis and Sergeant Michael Kerby, who developed and standardized the canine training and certification program for the NSP based on the Utah POST protocol, testified that the NSP recognizes two significant behaviors exhibited by a dog during a search and labels them "alert" and "indication." They pointed out that when a dog "alerts" there is a change in the dog's behavior which means the dog is detecting an odor. Duis and Kerby added that this behavior is different in every dog and that because it may involve only subtle changes in breathing, sniffing, or other behaviors, only the handler or someone familiar with the dog can identify it. They explained that this "alert" behavior may be to pull away from the handler, and to stop and work an area more intensely. Regarding the "indication" behavior, Duis and Kerby explained that this is the behavior a dog exhibits when it finds the strongest source of an odor. They stated that a dog will "indicate" by either stopping, pointing, or lying down if it is a "passive indicator," or barking, scratching or biting if it is an "aggressive indicator." Kerby further added that a trainer will reinforce this behavior by rewarding the dog, which is usually done by allowing it to play with a toy.

Kerby stated that an "indication" is "perfect world behavior," and added that dogs were trained to "indicate" "one hundred percent hoping for, ... eighty percent on the street." Consequently, the government contends that a behavior short of an "indication," which is what the NSP labels the "alert" behavior, is sufficient to provide probable cause if the handler, based on his training and experience with the dog, is able to identify the behavior as a positive detection of illegal substances.

---

1. Based on the evidence presented to the court, defendant contends Robbie was not a "well trained detection dog." *Place, supra.* Having reviewed Robbie's record, it is my opinion that his abilities as a detection dog are questionable. However, given the lack of evidence on what the NSP's standards are for continuing to use a dog, I shall not discuss whether those standards are sufficient to pass constitutional muster and whether Robbie met them with sufficient consistency for his actions to be a reliable indicator of probable cause for Fourth Amendment purposes. Such an examination is not necessary to my conclusions regarding the sufficiency of the dog's behavior to establish probable cause.

I disagree with the government's argument for several reasons.

First, the Eighth Circuit has held that a dog's manifestation of "interest," short of a positive alert,[2] does not constitute probable cause for a search. *See United States v. Jacobs*, 986 F.2d 1231 (8th Cir.1993). In *Jacobs*, a search warrant affidavit that stated that a detection dog had shown interest in a package by pushing it around with his nose and scratching it twice,[3] but failed to disclose that no official "alert"[4] had occurred, was held to render the warrant invalid under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The court further concluded that if that information had been included, the affidavit would not have provided probable cause for opening the package. *Jacobs*, 986 F.2d at 1235. Although at least one court has held that an officer's awareness of a dog's interest on closed items like bags, packages, or other containers may be considered by the court when determining whether the totality of circumstances established probable cause, the same court clarified that a dog's "interest" alone would not constitute probable cause. *See United States v. Guzman*, 75 F.3d 1090, 1096 (6th Cir.1996) (there was probable cause to seize defendant and his bag when officer had observed dog's interest in the bag, but had also touched the bag and felt large brick-like objects he believed to be drugs).

Second, Robbie's behavior, however it is labeled, was ambiguous. Although it is not exactly clear, it seems that Robbie, at most, exhibited an interest in the vehicle. However, as defendant's experts, John J. Browne, Dan J. Craig, and Michael Mitchell, all stated, this interest could be interpreted to stem from intentional or unintentional "cuing" by Duis. The videotape specifically shows Duis pulling on the leash at least once, and stopping in front of Robbie, blocking his way, several times. Such movements by Duis, whether or not they were intentionally made, further make Robbie's behavior even more ambiguous and cloud Duis' interpretation of such behavior. Handlers' cues, such as voice or physical signals, have been recognized to compromise a dog's objectivity and impermissibly lead the dog to alert at the suspected item or person. *United States v. Trayer*, 898 F.2d 805, 809 (D.C.Cir.1990) ("(W)e are mindful that less than scrupulously neutral procedures, which create at least the possibility of unconscious 'cuing', may well jeopardize the reliability of dog sniffs."), *cert. denied*, 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990); *see also United States v. $80,760.00*, 781 F.Supp. 462, 478 n. 36 (N.D.Tex.1991) (reliability problems arise when, among other things, the dog receives cues from its handler).

Third, even if I were to conclude that Duis' own actions, which themselves are ambiguous and subject to interpretation, did not "cue" Robbie to engage in the "alert" behavior, his behavior is not sufficient to establish probable cause. The reason is that an "alert," in NSP's parlance, is simply too subjective a standard to establish probable cause. The Supreme Court has interpreted the Fourth Amendment to have a "strong preference for searches conducted pursuant to a warrant" issued by a "neutral, detached" judicial officer, *see Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), unless the police officer has knowledge of "facts and circumstances ... sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. U.S.*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (citing *Gates supra*; *Brinegar*

---

**2.** Unlike the NSP, reported cases dealing with dog sniffs use the terms "alert" and "indication" interchangeably to describe an actual detection of illegal substances. In this opinion I use the terms as the NSP does, except when, as in this footnote, I am referring to their use in other cases.

**3.** This behavior correlates with what Duis and Kerby described as a dog's "alert" behavior.

**4.** That is, "indication" in NSP parlance.

*v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). The government's argument attempts to elevate the officer's subjective interpretations of a dog's ambiguous behavior—which itself may be noticeable only to the handler—to the level of "facts" sufficient to amount to probable cause. Relying on a dog's objectively observable "indication," again using NSP's parlance, already removes the establishment of "facts" necessary to provide probable cause one level from the officer's own observations, as the officer, being only human, cannot observe and has no knowledge of the odor of the drugs. Reliance on the dog's "alert" behavior alone, even if it were unambiguous, would remove the establishment of "facts and circumstances" needed for probable cause a level further from objective human observation. To remove the determination even further still, the government now asks the court to rely on the officer's interpretation of the dog's ambiguous behavior. This is simply too far removed to be "reasonable" for Fourth Amendment purposes.

It is certainly true that facts, once established, can seem to an a officer to be more indicative of criminal activity than would be apparent to the average citizen. *Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657 (citing *United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975)). However, there is no authority holding that the officers themselves, through subjective interpretations of ambiguous behaviors, may create those facts themselves. While *Place* indicated a willingness to accept a dog's sniff as a reliable substitute for human observation, such acceptance must be conditioned not only on whether the dog was "well-trained," but also on the objectively observable behavior resulting from the training—i.e. the "indication" behavior. In this case, while I assume Robbie was "well-trained," I find that objectively observable behavior was missing. Therefore, I conclude Robbie's behavior, regardless of how it is labeled, did not demonstrate probable cause for the presence of drugs or other illegal substances. The search of defendant's rental vehicle was made without probable cause and, thus, was not reasonable under the Fourth Amendment.

## (4) CUSTODIAL INTERROGATION

Finally, defendant argues that any statements he made during his custodial interrogation should be suppressed because they were involuntary and were the fruits of the illegal actions of Duis.

Having concluded that the search of defendant's vehicle was unlawful, I further conclude that defendant's arrest and subsequent interrogation were also unlawful and should, therefore, be suppressed as well. *Wong Sun v. United States,* 371 U.S. 471, 485–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## CONCLUSION

In accordance with the foregoing discussion, I shall recommend that defendant's motion to suppress, filing 11, be granted.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that defendant's motion to suppress, filing 11, be granted.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.

**FURTHER, IT HEREBY IS ORDERED,** trial of this matter is set to begin at 9:00 AM on August 21, 2000, or as soon thereafter as the case may be called, with jury selection at the commencement of trial. Trial is scheduled for three trial days.

July 13, 2000.