IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 17, 2017 Session

## STATE OF TENNESSEE v. TERRY LAMONT BOWDEN

Appeal from the Circuit Court for Williamson County
No. II-CR057314     Deanna B. Johnson, Judge[1]

No. M2016-02525-CCA-R3-CD

The Defendant, Terry Lamont Bowden, appeals his jury conviction for possession of marijuana with the intent to sell or deliver. On appeal, the Defendant challenges the trial court's denial of his motion to suppress the evidence obtained during the search of his vehicle, arguing that the drug-sniffing dog's "body language changes," as testified to by the officer handler, were insufficient to establish probable cause. He also argues that his absence at the initial suppression hearing violated Rule 43 of the Tennessee Rules of Criminal Procedure and his constitutional right to be present at trial. After a thorough review of the record and the applicable authorities, we conclude that the State failed to establish that the search of Defendant's vehicle was supported by probable cause and that the case should, therefore, be reversed. Accordingly, the Defendant's conviction is vacated, and the possession charge is dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed; Conviction Vacated; Case Dismissed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which, ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Eric M. Larsen (at motion for new trial hearing and on appeal), Franklin, Tennessee; and John P. Webb (at trial), Nashville, Tennessee, for the appellant, Terry Lamont Bowden.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Sean B. Duddy, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] We note that another judge decided the suppression issue that is the subject of this appeal. However, the Defendant's trial resulting in his conviction was presided over by The Honorable Deanna B. Johnson.

# OPINION
## FACTUAL BACKGROUND

On November 20, 2012, the Defendant was under surveillance for possible drug dealings. After the Defendant left his job at Jiffy Lube that day, officers' pulled him over for a window tint violation, and the "tint-meter" subsequently confirmed a violation. The Defendant refused to consent to a search the vehicle, and an officer on the scene "requested an air-sniff of the vehicle." Thereafter, City of Franklin Police Department Officer and K-9 handler Bret Spivey was directed to the traffic stop involving the Defendant. Upon his arrival, Officer Spivey made sure there was no one inside the suspect vehicle and that "the area was clear . . . of any distractions from other parties" before retrieving his dog, Axel, from his patrol car. He then took Axel to the suspect vehicle and gave him the command to search. According to Officer Spivey, Axel "alerted through numerous body language changes around the . . . back driver['s] side door." Officer Spivey placed Axel back inside the patrol car and advised the other officers that Axel had given "a positive indication[.]" Officer Spivey explained that the odor of a narcotic can travel inside a vehicle and that it was "not uncommon . . . in the K-9 world for a dog to indicate on a vehicle, on one part of the vehicle and to locate contraband in another part of it, based upon air flow and . . . things of that sort." Officer Spivey estimated that "less than five minutes" had passed between his arrival on the scene and Axel's alert.

Ultimately, 109.13 grams of marijuana were found in a large gallon-size bag under the front passenger seat of the vehicle, four cellular telephones were found inside the car, and an additional cellular telephone and $1,739 in cash were found on the Defendant's person. On May 13, 2013, the Williamson County grand jury indicted the Defendant with possession of marijuana with the intent to sell, a Class E felony, and a violation of the window tint statute, a Class C misdemeanor. See Tenn. Code Ann. §§ 39-17-417, 55-9-107.

The Defendant filed a motion to suppress on May 7, 2014, seeking to suppress "all evidence obtained as a result of the canine sniff and subsequent search of the Defendant's vehicle." He argued that "there [was] no factual basis to support the State's allegation that K-9 Officer [Bret Spivey's] dog, Axel, alerted on the vehicle." A hearing on the suppression motion was held on May 12, 2014. At the outset of the hearing, it was noted that the Defendant was not present. Defense counsel stated, "Your Honor, the [d]efense agrees to waive the presence of [the Defendant]." When the trial court asked if the Defendant "agree[d] to that," defense counsel said,

> He does, Your Honor. I have had . . . a conversation with him indicating
> that I suspected he would not be transported in due to the fact that he's only

recently been taken into custody in Davidson County. I think that he would prefer that we go ahead and proceed with this rather than not have a hearing at all.

With that, the trial court instructed the prosecutor to call his first witness, Officer Spivey.

Officer Spivey began by detailing his training and experience as a K-9 officer, which began in November 2008 with his dog Axel. Officer Spivey said that he and Axel had worked exclusively with one another since that time and that neither had any prior involvement with a different dog or handler. According to Officer Spivey, he and Axel completed the initial twenty-two-week class offered by the City of Franklin. During those twenty-two weeks, they "spent the majority of the time doing field work and training"; however, they also did "classroom work that involved video[-]based training and then case law . . . as it pertained to K-9." Officer Spivey and Axel were certified at the conclusion of their training and had been recertified annually by the United States Police K-9 Association. Additionally, they maintained sixteen hours of training per month due to the "dual purpose of their work," that being narcotics detection and patrol work. According to Officer Spivey, Axel was trained to detect five odors—marijuana, cocaine, crack cocaine, heroin, and methamphetamine.

Officer Spivey testified that, during his training, he learned about "the movement of odor"—for example, "airflow from inside the vehicle to outside can increase or decrease with windows being raised and lowered" and "the wind, traffic flow in the area, . . . weather, many different things would create an air flow issue with the odor of a narcotic." Officer Spivey confirmed that it was "absolutely" possible that a K-9 might alert at the rear of a vehicle but that the drugs were ultimately located in the front of the vehicle. He explained why this phenomenon occurred: "[A]n odor that is inside the vehicle does take the path of least resistance to exit the vehicle."

Officer Spivey's training also taught him to recognize when his dog smelled the odor of narcotics. According to Officer Spivey, a dog exhibits certain "body language changes" when it is "in odor," and those body language changes range from, but are not limited to, "a change in ear posture, a change in breathing pattern, their mouth could go from being open to being closed once they get inside the odor[,]" a change in tail position, or a change in head posture by starting "to lean forward." Officer Spivey described the process known as "bracketing": A dog begins "to bracket what we call the scent cone . . . . When he brackets the scent cone, he will get to the edge of it[,] realize he is out of odor, and he will come back. If he gets out of it on the other side he will come back." Officer Spivey testified that these were "good indicators and good body language changes that [he] ha[d] seen through [his] training and experience with [his] dog that [Axel] [was] in odor." When asked about Axel's specific "behavioral changes" once inside the "scent cone," Officer Spivey said that Axel exhibited a change in his

-3-

hunting behavior, meaning that his "hunt pattern" slowed down because he was becoming "more methodical"; Axel's mouth would close; Axel's nose and head would "extend forward"; Axel's "ear set" would change by his ears "be[ing] on point"; Axel's tail would become erect; and Axel's "body posture stiffen[ed]." Officer Spivey continued, "[I]f there is an availability to the source of the odor, my dog will work his way through the scent cone. Once he gets to the source he is an aggressive alerting dog, or an active alerting dog, which means . . . he will scratch, bite, bark, whatever he can to try to attempt to achieve a reward."

Officer Spivey explained that a "false positive" "is a situation in which a K-9 is deployed, gives a positive indication, and upon search and investigation there is no source of any odor nor . . . is there any corroborating evidence to say that there was odor that was present." According to Officer Spivey, Axel never gave a false positive during training. Officer Spivey then described a "false negative" as "a situation in which the dog is deployed. The dog sniffs an area. Does not give any indication to the odor of any narcotic. And upon completion of the search and later investigation it is determined that there . . . was an odor that was present." Axel had given a false negative during training, according to Officer Spivey. However, after a false negative, the dog is typically brought "back to the odor" for a second try because "[t]here are many different reasons that would cause the dog not to be in odor," such as his head's being above or below the odor.

Officer Spivey testified that he kept a log of Axel's performance while in the field, although only the "ultimate conclusion that an alert occurred," and not the specific behaviors, was recorded. Officer Spivey agreed that, on occasion, Axel had given a false positive in the field. However, after a false positive, Officer Spivey would conduct "a follow-up investigation" speaking with the occupants of the vehicle and trying "to find out if there [was] an underlying cause for the dog alert." Officer Spivey exampled such underlying reasons—for instance, an occupant had "been around a narcotic and actually introduced a residual odor to the vehicle" or had "smoked in the vehicle prior to being stopped" and "had gotten rid of any evidence from that point"; or the vehicle's occupants were uncooperative and did not corroborate the presence of a residual odor; or the officers' inability to search and find the narcotic inside the car. The times when Axel had given a false positive and no underlying cause was detected were "few and far between," according to Officer Spivey.

Turning to the stop of the Defendant on November 20, 2012, Officer Spivey testified that Axel was on a leash when Officer Spivey walked him up to the vehicle and commanded, "[F]ind dope." Axel was then allowed "to do an open scan," meaning that he was no longer being led by Officer Spivey but was instead leading the search. Officer Spivey explained that, "if on that first open scan . . . there is no alert, we will take the dog and try to present to them the areas . . . that they have not gotten to on their initial scan."

Officer Spivey described that, during this second scan, he used his hand to lead Axel to certain parts of the vehicle, like "door seams, lights, trunk seams, and hood seams." Officer Spivey continued that, if there was no alert the second time around the car, then the search was usually called off, and the dog was returned to the patrol car.

During the first scan of the Defendant's vehicle, Officer Spivey observed Axel's starting to display "body language changes" as he approached the rear driver's side door. Officer Spivey believed that Axel "was in the odor of a narcotic" at that point in time. Officer Spivey stated that he had observed similar body language changes by Axel on occasions where drugs had been discovered and that Axel's body language changes "were consistent with the changes" that had been observed during training. However, Officer Spivey could not "recall if [Axel] was able to get to the final response being the scratch, bark, [or] bite." Nonetheless, based on Axel's body language changes and "his change in hunt behavior," Officer Spivey "called it a positive alert." Officer Spivey averred "that observation of that alert" was "based on [his] training and experience." Officer Spivey then returned Axel to the patrol car and assisted the other officers with searching the Defendant's car.

On cross-examination, Officer Spivey was asked to describe how Axel's "hunt pattern" "slow[ed] down and bec[ame] more directed" upon smelling a trained-for narcotic. Officer Spivey explained, "Rather than continuing his circle around the vehicle, . . . [Axel] physically throws the brakes on and begins to search the area in which he caught wind of an odor," or stating it another way, "he will walk slower and he will narrow his search pattern and he will actually go back and forth whenever he is in a scent cone."

Officer Spivey clarified that "[t]he scratch is primarily what we train" as an active alert behavior, that "a bite does come . . . into the equation whenever we begin tossing toys as a reward," and that "barking typically comes out as a . . . frustration alert . . . if they are not getting rewarded." When asked if the other behaviors Officer Spivey testified to regarding Axel's "posture changes, the slowing down of his walk, the mouth closing, the tail becoming erect and the ears becoming erect" were "trained responses for the dog," Officer Spivey replied, "No, sir, those are responses that once they get into the odor it is actually a natural response as a dog[.]"

When asked how many times he led Axel around the Defendant's vehicle, Officer Spivey could not recall "actually having to lead him around the car," so he believed "it was on [an] open scan" that Axel exhibited those body language changes. Officer Spivey testified that he was able "to recognize in the moment when [Axel] [was] actually in and out of odor." According to Officer Spivey, when Axel attempts to hone in on a smell, he begins bracketing, "work[ing] it all the way back in until he can work his way to the

-5-

source if that's possible." Officer Spivey maintained that the body language changes occur while Axel "works his way into the scent cone[.]"

When asked to describe the specific body language changes Axel exhibited during the open scan of the Defendant's vehicle, Officer Spivey replied, "It was . . . clear and obvious body language changes. I don't recall exactly what they were. But he did display enough that I . . . believ[ed] he was alerting at the time[.]" Officer Spivey again stated that he did not recall Axel's giving a final response such as biting, barking, or scratching, but he "believed that it was coming" due to Axel's body language changes.

Officer Spivey could not "recall having video" from his patrol car that recorded the stop. According to Officer Spivey, "at that point in time, the video that was in [his] patrol car was hit or miss if it worked or not. And, on top of that [he] was about the . . . third car in line, so had [his] video been on, it would not have . . . gotten a search at that point."

After Officer Spivey's testimony, defense counsel argued that "some sort of record should be made" regarding the dog's behavior, otherwise, "I don't know how [c]ourts are able to act as a check on these canine searches other than to just rely blindly on the officer's expertise." Defense counsel stated that he was not "challenging the truthfulness" of Officer Spivey's testimony but noted that "we can't independently verify whether or not the dog alerted because a record was not created to be able to do that."

The trial court then denied the Defendant's motion, reasoning that Axel was reliable based upon his certification and training and that, based upon the totality of the circumstances, "Axel's conduct . . . of alerting on the [D]efendant's vehicle certainly [rose] to the level of probable cause that would justify a search of the vehicle."

Thereafter, on May 16, 2014, the Defendant entered an open guilty plea to the possession charge, and the window tint violation was dismissed. However, the Defendant was later permitted to withdraw that plea, and the case was reset for trial.

The Defendant then filed another motion to suppress, which alleged that, "during the initial traffic stop that was based upon the pretext of a window violation, . . . officers unconstitutionally prolonged this initial encounter to pursue a drug investigation without any reasonable suspicion of criminal activity required to detain him." The trial court heard this motion on the day of trial, July 20, 2015, with the Defendant present. Officer Spivey again testified, and two other officers involved in the Defendant's traffic stop also testified. Also, at the second suppression hearing, the prosecutor noted for the record that "a suppression hearing ha[d] already been conducted with regard to the credibility of the K-9 officer and his unit." The trial court denied the motion, and the case proceeded to trial.

The jury convicted the Defendant, as charged, of possession of marijuana with the intent to sell. The trial court sentenced the Defendant as a Range III, persistent offender to six years in the Department of Correction.

The Defendant filed a motion for new trial, wherein he raised the suppression issue regarding the canine search as error and also alleged that the trial court committed error at the May 12, 2014 suppression hearing because the Defendant himself was not present.[2] The Defendant contended that, "without a properly executed waiver, [his] fundamental constitutional right to be present at all stages of trial was violated" when he was absent at the suppression hearing. He further submitted that his absence violated Rule 43 of the Tennessee Rules of Criminal Procedure. After the Defendant's motion for new trial was denied, this appeal followed.

ANALYSIS

The Defendant raises two issues on appeal: (1) whether the trial court erred by concluding that Axel's body language changes were sufficient to establish probable cause for the search of the Defendant's vehicle; and (2) whether the Defendant's absence from the initial suppression hearing violated Rule 43 of the Tennessee Rules of Criminal Procedure and his constitutional right to be present at trial. The State asks that we affirm.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution guarantee the right to be free from unreasonable searches and seizures. Tennessee's constitutional protections regarding searches and seizures are identical in intent and purpose to those in the federal constitution. State v. Turner, 297 S.W.3d 155, 165 (Tenn. 2009). In evaluating the constitutionality of warrantless searches, this court must "evaluate the search or seizure under traditional standards of

---

[2] At this point in the proceedings, trial counsel had been allowed to withdraw, and substitute counsel had been appointed to represent the Defendant.

reasonableness" by balancing an individual's privacy interests against legitimate governmental interests. Wyoming v. Houghton, 526 U.S. 295, 300 (1999). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 630 (Tenn. 1997). The State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. State v. Harris, 280 S.W.3d 832, 839 (Tenn. Crim. App. 2008).

An automobile stop constitutes a "seizure" within the meaning of both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. Delaware v. Prouse, 440 U.S. 648, 653 (1979); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). The authorities must have probable cause or an "articulable and reasonable suspicion" to believe that a traffic violation has occurred when they initiate a traffic stop. Whren v. U.S., 517 U.S. 806, 810 (1996). In this case, the Defendant was stopped for a possible window tint violation pursuant to Tennessee Code Annotated section 55-9-107, and the Defendant raises no issue in that regard. The Tennessee Supreme Court has previously held that "a canine sweep around the perimeter of a vehicle which has been legally detained does not constitute a search, and thus, does not require probable cause or reasonable suspicion[.]" State v. England, 19 S.W.3d 762, 764 (Tenn. 2000).

A positive reaction to a vehicle by a trained drug detection dog provides probable cause to search the inside of a vehicle. England, 19 S.W.3d at 769. In order to find that an officer had probable cause to search a vehicle based upon a positive alert by a trained drug detection dog, the dog's reliability must be established. Id. at 768. This includes consideration of the dog's training, the officer's training and experience with the dog, and the record of false negative and false positive alerts. Id.

Most recently, the United States Supreme Court, in Florida v. Harris, 568 U.S. 237 (2013), examined the type of evidence the State must present to establish that a drug detection dog's "alert" to the odor of contraband was reliable enough to establish probable cause for a vehicle search on the highway. The Court rejected the Florida Supreme Court's holding "that the State must in every case present an exhaustive set of records, including a log of the dog's performance in the field, to establish the dog's reliability." Id. at 240.

> In short, a probable-cause hearing focusing on a dog's alert should proceed much like any other. The court should allow the parties to make their best case, consistent with the usual rules of criminal procedure . . . . If the State has produced proof from controlled settings that a dog performs reliably in

detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence . . . . The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.

Id. at 247-48.

Here, at the suppression hearing, the trial court denied the Defendant's motion, reasoning that Axel was reliable based upon his certification and training and that, based upon the totality of the circumstances, "Axel's conduct . . . of alerting on the [D]efendant's vehicle certainly [rose] to the level of probable cause that would justify a search of the vehicle." In addition to the ruling on the record made at the May 12, 2014 suppression hearing, the trial court addressed the issue in its order denying the Defendant's motion for a new trial. The trial court concluded that, because Axel had received training in detecting narcotics, was annually certified, and "had a proven record of positive drug detections," Axel's "detection gave the officers probable cause to search [the] Defendant's vehicle." In reaching this conclusion, the trial court relied on this court's 2008 decision in Harris, 280 S.W.3d 832. However, we do not find Harris dispositive of the issue raised.

In Harris, this court concluded that "the dog's positive reaction to the defendant's car provided probable cause to search the car[.]" 280 S.W.3d at 843 (citations omitted). The Harris court reasoned that the record established that the officer was trained in narcotics detection, that the dog was trained to detect the presence of narcotics, that the dog was "certified" as a drug dog annually, and that the dog had a proven record of such drug detections. Id. at 843. However, in Harris, the dog "showed a noted response on the passenger-side door, . . . scratching on the passenger-side door." Id. at 838. In the present case, Officer Spivey could not testify that Axel gave his trained, final response of barking, biting, or scratching. Moreover, the Defendant is not challenging Axel's reliability but is instead arguing that Axel's body language changes did not establish probable cause to search. This appears to be an issue of first impression in this State.

At this juncture, we find it necessary to address some of the terminology that is often used with regard to the behavior and training of detection dogs. Detector dogs are trained to repeat a certain behavior to show their handlers that they have identified the certain illegal drugs they were taught to find. United States v. Johnson, 323 F.3d 566, 567 (7th Cir. 2003) (citing Sandy Bryson, Police Dog Tactics 257 (2d ed. 2000)). A dog "alerts" when it gives its particular trained response, which indicates drugs are present in

-9-

a particular place.  See United States v. Wilson, 995 F. Supp. 2d 455, 473 (W.D.N.C. 2014) ("An 'alert' would ordinarily refer to the specific behavior a dog is trained to do when he encounters the source of the odor he is trained to detect.").  The manner by which a dog alerts is "dog-specific."  United States v. Morales, 489 F. Supp. 2d 1250, 1253 (D.N.M. 2007).  In general, dogs are trained to alert "aggressively," during which the dog will scratch or bite at the source of the odor, or "passively," during which the dog will sit down or point.  Id.  Officer Spivey testified that Axel was an actively alerting dog.  Moreover, "[a] detection dog will, in some instances, perform something less than an alert when encountering certain stimuli, which is sometimes referred to as 'casting.'"  Wilson, 995 F. Supp. 2d at 474.  Casting is akin to what Officer Spivey said he detected as Axel's behavior changed and to what he described as bracketing.

In United States v. Rivas, 157 F.3d 364 (5th Cir. 1998), customs officials at the Brownsville, Texas, Port of Entry led a drug detection dog around the perimeter of what appeared to be an empty auto transport trailer Rivas was hauling with his Kenworth truck.  In reality, the trailer held forty one-kilogram bricks of cocaine secreted in its steel frame.  According to the customs officials, the detection dog deployed around Rivas' trailer was trained to indicate actively; the dog would alert by aggressively scratching or attempting to bite at the source of the odor.  Id. at 368.  The dog, however, did not alert but instead "cast," according to the customs official.  When the official was asked what was meant by the term "cast," he replied, "'casting' is in a sense the dog maybe feels not a strong alert, but something that temporarily stops him and deters his attention at that point."  Id.  The Rivas court concluded that a dog's "casting" was too distantly related to an alert to create reasonable suspicion on its own as a matter of law, thus affirming the suppression of the drugs seized from the trailer.  Id.

In United States v. Parada, 577 F.3d 1275 (10th Cir. 2009), a Kansas highway patrolman stopped the defendant's van for a traffic violation.  Noticing some unusual circumstances, the trooper retrieved his drug dog from his cruiser and walked the dog around the defendant's van.  Even though the trooper's dog was an active alert dog, the trooper stated his dog "alerted" to the driver's side of the van by "stiffening his body, breathing deeply, and attempting to jump into the window."  Id. at 1281.  The trooper went on to explain his understanding of an alert versus an indication:

> Followed up by an alert is an indication.  The indication is a conclusion of the search where the dog through its physical characteristics and natural abilities pinpoints that exact location of where the odor is coming from . . . . [T]he way that Rico indicates is basically done through scratching, biting, barking, any number of things.

Id.  Based on this explanation, the Parada court followed the Tenth Circuit's general rule that "a dog's alert to the presence of contraband is sufficient to provide probable

cause[,]" declining "to adopt the stricter rule urged by [the defendant], which would require the dog to give a final indication before probable cause is established." Id. at 1282. Using these terms somewhat more loosely, the Tenth Circuit determined that a "casting" (what it called an "alert") was sufficient to provide probable cause, even in the absence of a true alert (which it called a "final indication").

To the extent that these cases can be seen as adopting bright-line rules for probable cause to search regarding an alert or final indication versus casting or bracketing, we decline to follow their lead. Taking this "practical and common-sensical" approach, the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." Harris, 568 U.S. at 244; see also Illinois v. Gates, 462 U.S. 213 (1983) (affirming a totality-of-the-circumstances approach to probable cause). Accordingly, we conclude that, while it is not true that anything less than a full, final indication is inherently unreliable, "on a spectrum of reliability, a final indication consistent with the K-9's training is at the most reliable end, and other changes of behavior fall somewhere short of that." United States v. Heald, 165 F. Supp. 3d 765, 778 n.20 (W.D. Ark. 2015).

> Our Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers. So long as officers are able to <u>articulate specific, reasonable examples of the dog's behavior</u> that signaled the presence of illegal narcotics, the [c]ourt will not engage itself in the evaluation of whether that dog should have an alternative means to indicate the presence of the drugs.

United States v. Holleman, 743 F.3d 1152, 1156 (8th Cir. 2014) (emphasis added). We believe that this is consistent with the approach outlined by the United States Supreme Court in Harris: "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." 568 U.S. at 248.

For example, in United States v. Heir, the court found a lack of probable cause to search when the dog "alerted" to the presence of drugs by sniffing more intensely around certain parts of the vehicle. 107 F. Supp. 2d 1088 (D. Neb. 2000). There, the detection dog was trained to do an "aggressive" alert when he detected the presence of drugs by pawing and scratching at the car. Id. at 1091. Although the dog did not give its trained response, the handler testified that the dog's alert was "subtle" and might only be recognized by himself or another person familiar with the dog's tendencies. Id. The court suppressed the evidence and found that "there must be an objectively observable 'indication' by the dog of the presence of drugs" because the behavior described by the

handler was too subjective to use as a standard to establish probable cause. Id. at 1091-96.

"A court cannot accept a handler's subjective determination that a dog has made some otherwise undetectable alert, which conclusion would be, for all practical purposes, immune from review." Wilson, 995 F. Supp. 2d at 475. Given the nature of the constitutional right at issue, the Supreme Court has found this premise to be unacceptable. "If [an officer's] subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." Id. (quoting Beck v. Ohio, 379 U.S. 89, 97 (1964)). With law enforcement's use of detection dogs, the dog becomes the functional equivalent of the magistrate. Id. Because a magistrate's warrant must set forth the objective basis informing the probable cause determination, it is "reasonable" (in the Fourth Amendment sense) to demand no less than the same clarity from a magistrate's proxy. Id. Even assuming the dog is a "well trained narcotics detection dog," the behavior of the dog must objectively demonstrate the presence of drugs to amount to probable cause for a search. Heir, 107 F. Supp. 2d at 1095.

Although some lesser, yet objectively definitive, behavior changes by a dog may be sufficient to establish probable cause under some circumstances, there is no evidence of such here. Officer Spivey testified that Axel started to display "body language changes" as he approached the rear driver's side door of the Defendant's vehicle and that he believed that Axel "was in the odor of a narcotic" at that point in time. Officer Spivey stated that he had observed similar body language changes by Axel on occasions where drugs had been discovered and that Axel's body language changes "were consistent with the changes" that had been observed during training. Based on Axel's body language changes and "his change in hunt behavior," Officer Spivey "called it a positive alert." However, Officer Spivey could not "recall if [Axel] was able to get to the final response being the scratch, bark, [or] bite." Moreover, Officer Spivey could not describe the specific body language changes Axel exhibited during the open scan of the Defendant's vehicle, stating only that they were "clear and obvious body language changes." While Officer Spivey explained bracketing, he was unable to say that Axel engaged in such behavior on this occasion. Accordingly, we conclude that Officer Spivey was unable to articulate specific, reasonable examples of the Axel's behavior that signaled the presence of illegal narcotics.

Moreover, we note that there was no video recording of the stop provided, and the State has the burden to demonstrate, by a preponderance of the evidence, that a warrantless search passes constitutional muster. See Harris, 280 S.W.3d at 839. To allow a search predicated upon an officer's interpretation of "the utterly minimalist lesser showing" provided by the State in this case "would be tantamount to permitting law

-12-

enforcement officers to issue their own search warrants based upon their own subjective analysis, something the Framers explicitly prohibited." See Wilson, 995 F. Supp. 2d at 475. As a result, we conclude that the trial court erred in denying the Defendant's motion to suppress the evidence obtained during the search of his car.

The Defendant also argues that his absence from the initial suppression hearing violated Rule 43 of the Tennessee Rules of Criminal Procedure[3] and his constitutional right to be present at trial. However, defense counsel waived the Defendant's presence after indicating to the trial court that he had spoken with the Defendant about the matter. The Defendant never made any contention that he did not provide defense counsel with express authority to waive his presence at the suppression hearing. Furthermore, the Defendant was present for the second suppression hearing when Officer Spivey again testified regarding the legality of the traffic stop and subsequent search of the Defendant's vehicle. No objection was lodged, and the Defendant did not raise the issue until after trial. Moreover, the Defendant did not make any allegations that the result of the suppression hearing would have been different had he been present. He failed to explain what testimony he would have given or how such testimony would have impacted his case. Accordingly, the Defendant has waived appellate review of this issue. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is reversed, and the Defendant's conviction is vacated. The possession charge, being unsupported by any further evidence, is dismissed.

_____
D. KELLY THOMAS, JR., JUDGE

_____

[3] Rule 43(a) requires, absent proper excuse, a defendant's presence at "arraignment," "every stage of the trial, including the impaneling of the jury and the return of the verdict," and "the imposition of sentence." The rule further provides that "[a] defendant need not be present . . . [a]t a conference or argument on a question of law." Tenn. R. Crim. P. 43(d).