FILED
United States Court of Appeals
Tenth Circuit

**August 25, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 07-3272

NORMAN A PARADA,

Defendant-Appellant.

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 03-CR-40053-JAR)**

Michael M. Jackson, Topeka, Kansas, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **HENRY**, Chief Circuit Judge, **SEYMOUR** and **ANDERSON**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Norman A. Parada, John McNeill, Tiffany Poulin, and Kelly Bradley were charged in federal court with possession of PCP with intent to distribute and conspiracy to possess PCP with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Poulin and Bradley entered plea agreements with the government. Mr. Parada and McNeill were tried together and convicted as charged. In a prior consolidated appeal, we affirmed McNeill's conviction but reversed Mr. Parada's conviction for an evidentiary error. *United States v. McNeill*, 136 F. App'x 153, 158 (10th Cir. 2005) (unpublished). Mr. Parada was subsequently retried and convicted. He appeals, arguing (1) the district court erred in denying his motion to suppress and (2) the evidence was insufficient to support his conviction.

The charges stem from the following events.[1] In 2003, Kelly Bradley was contacted by her cousin, who told her that a mutual contact, "Face," a.k.a. Norman Parada, needed to travel to Los Angeles, California and was looking for a licensed driver. Bradley was to receive $200 payment up-front. Mr. Parada had a friend rent a vehicle and add Bradley as a driver. In preparation for the trip, Mr. Parada purchased the cooler that was later used to transport the PCP. Mr. Parada, McNeill, Bradley, Poulin, and "Fly" Smith made the cross-country trip from

_____

[1] The facts regarding the search and seizure were fully laid out in Mr. Parada's first appeal and are not repeated here. *See McNeill*, 136 F. App'x at 154-56. We discuss only those facts relevant to the motion to suppress and the sufficiency of the evidence challenge.

-2-

Virginia to California in two days, traveling through the night and arriving on March 10, 2003. Bradley did most the driving, but Mr. Parada took over when they got to Los Angeles because he was familiar with the city and knew where the hotel was located.

The afternoon after their arrival in Los Angeles, Smith and Mr. Parada met a visitor at the hotel suite, after first asking Poulin and Bradley to go upstairs. Later that day, as Bradley was cleaning the suite, she noticed jugs of PCP under the kitchen counter. When she asked Mr. Parada about it, he responded, "[D]on't worry about it. It's not mine. I don't have nothing to do with it." Rec. vol. VI at 232. He then said that Smith was going to take it, again telling Bradley, "Don't worry about it. We're gonna – it is has nothing to do with you." *Id.* at 233.

Mr. Parada and Smith packed the van before the group began the drive back to Virginia the following morning, March 11. Bradley testified that when she became aware the PCP was in the van, she began crying and asked to go back with Smith, who was staying behind for an additional day. Mr. Parada encouraged her to stay with the group to drive the van, again telling her not to worry about the PCP.

The next day, Officer James Oehm stopped the van outside Junction City, Kansas for a traffic violation. After forming a suspicion of illegal activity due to the presence of multiple air fresheners in the vehicle, discrepancies in the rental agreement, and the driver's nervous demeanor, Officer Oehm retrieved his drug-

sniffing dog, Rico, from his patrol car. As Officer Oehm walked Rico counterclockwise around the vehicle, he tapped on the van, indicating the search pattern to the dog. Rico alerted at the driver's side window. Officer Oehm testified that the dog's body stiffened and his breathing became deeper and more rapid, signaling that he had discovered an odor he was trained to detect. According to Officer Oehm, Rico tried to jump in the window, but Oehm pulled him off before he succeeded. Rico did not indicate or pinpoint the source of the odor, which Officer Oehm believed was due to his not allowing the dog inside the vehicle. Officers later found a small amount of marijuana in the side pocket of the front passenger door, which was likely the cause of Rico's alert because he is not trained to detect PCP, the drug later found in large quantities in the back of the van.

Ms. Bradley testified that after the van was pulled over, Mr. Parada called Smith and asked him what to do. Mr. Parada then told the group Smith had advised that one person "stand up and take the case." Rec., vol. VI at 246. He urged Poulin to claim responsibility for the drugs, which she initially agreed to do. Mr. Parada also advised the group to tell the officers they were coming from a wedding in Colorado, and, in order to make the story more believable, to say that McNeill was Bradley's boyfriend, since Parada and Poulin were already a couple. He told them not to say they were coming from California, because "the more states that we crossed with the PCP, that would be more time that we would

-4-

end up getting [under drug trafficking laws]." Rec., vol. VI at 247, 261. Later, while incarcerated, Mr. Parada sent Bradley a letter, telling her: "The number one thing is to stay quiet and stay to the same story." *Id.* at 265. The government also introduced letters Mr. Parada sent to Poulin referencing the large sum of money he lost when the police seized the PCP.

### *Motion to Suppress*

Mr. Parada raises several arguments in support of his claim that the district court erred in denying his motion to suppress. First, he challenges the continued detention of the van following the driver's refusal to consent to a search of the vehicle. He argues that the police lacked reasonable suspicion to detain him beyond the time necessary to complete the purpose of the traffic stop; *i.e.*, running a license check and issuing a warning. In Mr. Parada's prior appeal to this court, we addressed a similar argument with respect to his co-defendant, McNeill. We held that by the time the driver declined to give consent to search the van, the officer had reasonable suspicion a crime was occurring, therefore permitting the dog sniff. The dog alert then gave the officer probable cause to search. *McNeill*, 136 F. App'x at 156. We affirmed McNeill's conviction, concluding that "there was no unlawful search and seizure." *Id.* Because we reversed Mr. Parada's conviction on an evidentiary issue, we did not consider his other arguments. *Id.* at 158.

-5-

The government contends Mr. Parada is precluded from challenging his detention under the law of the case doctrine.

> The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Furthermore, when a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue.

*United States v. LaHue*, 261 F.3d 993, 1010 (10th Cir. 2001) (citations and quotation marks omitted). We are mindful that "the law of the case doctrine is not an inexorable command, but, rather, only a rule of practice in the courts and not a limit of their power." *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998). But, "it is almost axiomatic that one panel of this court cannot overrule another panel." *Id.* We depart from the law of the case doctrine, in "exceptionally narrow circumstances:" "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Id.* Mr. Parada does not argue that any of these exceptions apply. Because Mr. Parada is identically situated to McNeill – both men were passengers in the vehicle – the legal issue concerning their detention is the same. As such, the law of the case doctrine applies, and we decline to consider Mr. Parada's argument regarding his

detention.[2]

Mr. Parada also contests the search of the cooler. The district court found that he lacked standing to challenge that search, a determination we review *de novo*. *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000). We consider two factors in determining whether a defendant has standing to assert a violation of his Fourth Amendment rights: "whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *Id.*; *accord United States v. Edwards*, 242 F.3d 928, 936 (10th Cir. 2001). In the context of automobile searches, we have held the following criteria "important[] though not determinative": "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Allen*, 235 F.3d at 489.

Mr. Parada has not satisfied any of these criteria. Officer Oehm testified that no one responded when he asked the group who owned the cooler and Mr. Parada neither testified at the suppression hearing nor presented any other

---

[2] Because we hold that there was no unlawful search or seizure, we need not address the issue of whether Mr. Parada would have standing to challenge the lawfulness of his continued detention under *United States v. DeLuca*, 269 F.3d 1128 (10th Cir. 2001).

evidence establishing his possessory interest in the cooler.  In addition, Mr. Parada did not have personal belongings in the cooler, another factor we have considered in determining whether the defendant meets the two-part standing test. *See Edwards*, 242 F.3d at 937.  We conclude that Mr. Parada did not establish he had standing to challenge the search of the cooler: "the mere fact of presence in the car [is] . . . insufficient to meet the defendant's burden of proving standing."[3] *Allen*, 235 F.3d at 489.

Mr. Parada makes several arguments related to the dog sniff.  First, he challenges the district court's finding that the dog alerted.  We review that determination for clear error.  *United States v. Orduna-Martinez*, 561 F.3d 1134, 1137 (10th Cir. 2009).  Officer Oehm testified that Rico alerted on the driver's side front door by stiffening his body, breathing deeply, and attempting to jump into the window.  At the suppression hearing, Mr. Parada presented an affidavit from an expert who, after reviewing the videotape of the encounter, stated that the dog did not make a defined final response.  We have reviewed the record and we do not see clear error in the district court's finding.  Although the quality of the videotape is poor, making it difficult to see the dog's response, Officer Oehm testified to that fact at the evidentiary hearing and the district court was able to

---

[3] The only evidence that Mr. Parada owned the cooler came from the testimony of Bradley, a government witness who testified at trial but not at the suppression hearing.

judge his credibility. Absent clear error, we affirm the district court's finding that the dog alerted.

Mr. Parada also argues that a general alert without a final indication is insufficient to create probable cause to search. Under our case law, a random dog sniff is not a search for Fourth Amendment purposes, and a positive dog alert gives officers probable cause to search.[4] *See United Stats v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993). We review the district court's determination of probable cause *de novo. See id.*

> Officer Oehm explained the distinction between an alert and an indication:
>
> There's a series of ways that the dog will inform me that the odor [of narcotics he is trained to detect] is present. One – one way is the dog alerts. The other is the dog indicates. Rico's alert is identified by his physical reaction and response upon recognition of an odor which he is trained to detect. . . . He alerts by an increased rapid deep breathing, body stiffening, and upbreaking from the search pattern itself that we are engaged in around a particular item, whether it's in a house or around a vehicle. His alert basically tells me that the odor which he is trained to detect is present. . . . Followed up by an alert is an indication. The indication is a conclusion of the search where the dog through its physical characteristics and natural abilities pinpoints that exact location of where the odor is coming from. . . . [T]he way that Rico indicates is basically done through scratching, biting, barking, any number of things.

Supp. Rec., vol. I at 38-39.[5] Rico did not give a final indication. Officer Oehm

---

[4] In exceptional cases, "a dog alert might not give probable cause if the particular dog had a poor accuracy record." *Ludwig*, 10 F.3d at 1527.

[5] Officer Oehm's testimony is consistent with that of the officer in *United States v. Forbes*, 528 F.3d 1273, 1276 (10th Cir. 2008):

(continued...)

believes he would have had he been permitted to enter the van.

One of our early dog sniff cases assumed without deciding that the police had only reasonable suspicion until the dog "keyed," *i.e.*, indicated, the exact location of the drugs whereupon officers had probable cause to search. *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1984). The precise issue raised by Mr. Parada was not before the court in *Stone*, however, and our later cases have not distinguished between a general alert and a pinpoint indication for the purposes of the probable cause analysis.

In a recent case, *United States v. Forbes*, we noted the distinction between an alert and an indication but phrased the rule in terms of the former: "a canine's alert to the presence of contraband during an exterior sniff of a vehicle gives rise to probable cause for agents to search that vehicle's interior." 528 F.3d 1273, 1277 (10th Cir. 2008).[6] Similarly, in *United States v. Williams*, 726 F.2d 661,

---

[5](...continued)
[A] properly trained canine will "alert" to the presence of contraband when it first encounters a known odor by changing its body posture and by increasing its respiration. By contrast, the same dog will "indicate" the precise location of that contraband through some other change in behavior, such as by staring, sitting, scratching, biting, or barking. Such an "indication" is generally given at the point where the odor of the contraband is at its strongest.

[6] In *Forbes*, the dog "alerted to the presence of a controlled substance by changing her posture and by increasing her respiration. As the agent moved the dog around the front of the tractor, she continued to alert and finally stopped and 'indicated' the presence of contraband at the driver's side door by using a pinpoint stare." *Id.* at 1275.

663-64 (10th Cir. 1984), although from the facts of the case it appears that the dog provided a final indication by scratching and biting at the suspect piece of luggage, we noted only that "a drug sniffing dog's detection of contraband in luggage itself establishes probable cause." (quotation marks and alteration omitted).

Our other dog alert cases do not specify whether the dog's response was a general alert or a final indication; we have simply noted that the dog's "alert" provides probable cause. *See, e.g.*, *Ludwig*, 10 F.3d at 1525 (dog's "alert" to the trunk indicated the presence of illegal drugs and provided probable cause); *United States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir. 1994) (dog's "alert" to vehicle provided probable cause to arrest occupants and search vehicle).

Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established.[7] "Probable cause means that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Ludwig*, 10 F.3d at 1527 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A trained narcotic dog's detection of the odor of an illegal

---

[7] Mr. Parada relies on *United States v. Heir*, 107 F. Supp. 2d 1088, 1095 (D. Neb. 2000), which held that an alert without a subsequent indication does not provide probable cause, but that decision is not binding on us, and for the reasons explained here, we do not find it persuasive.

substance emanating from a vehicle creates a "fair probability" that there is contraband in that vehicle. *See id.* ("[A] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband."). We hold that probable cause was satisfied by Rico's alert to the odor of an illegal substance in the vehicle and that it was not necessary for the dog to indicate the exact source of that odor. Indeed, it might be dangerous to permit a narcotics dog to pinpoint the location of the drugs in certain circumstances, such as here, where the vehicle's occupants were still inside and the dog was trained to indicate by barking, scratching, and biting at the source of the odor.

Mr. Parada, relying on *United States v. Ross*, 456 U.S. 798 (1982), argues that even if Rico did alert, providing probable cause, the scope of the search was unlawful. He contends that because the dog only alerted to the driver's side door area, the search should have been limited to that area of the vehicle. Our cases dictate otherwise: "[A] canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well." *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004). We explained in *Rosborough* that "[a] dog alert creates general probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand." *Id. Ross* does not help Mr. Parada. To the contrary, it further supports our conclusion here. In *Ross*, the Supreme Court held that "[i]f probable cause justifies the search of a lawfully

stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825. Thus, the officers had probable cause to search the entire vehicle based on the dog's alert to the front driver's side door.

The final issue regarding the dog sniff is Rico's reliability. In *Ludwig,* we suggested that "[a] dog alert might not give probable cause if the particular dog had a poor accuracy record." 10 F.3d at 1528. As the party seeking to suppress the evidence, Mr. Parada bears the burden of proving the dog is unqualified. *See United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009). Officer Oehm testified that Rico had completed a training course and was certified as a narcotics dog by Detector Dogs International. The only evidence Mr. Parada submitted concerning Rico's reliability was an affidavit from a defense expert who concluded that "[t]he methodology used to train, maintain, and use this detector dog in the field does not comply with scientific principles demanded by the use of operant conditioning"and does not comply with "established industry standards of dog training and utilization." Rec., vol. 2, doc. 280 at 6. There is nothing in the record indicating that Rico had not been fully trained and certified. In fact, Rico has a certification and there is no evidence that he had a poor accuracy record or that his certification was ever revoked. *See United States v. Kennedy*, 131 F.3d 1371, 1376-77 (10th Cir. 1997). Based on this record, we are not persuaded the district court's finding that "at the time of the search, Rico was adequately trained

and certified and in good health" was clearly erroneous. Rec., vol. II, doc. 278 at 6.

*Sufficiency of the Evidence*

Mr. Parada also contends the evidence presented at trial is insufficient to support the jury's finding of guilt. We review sufficiency of the evidence challenges *de novo*, viewing the evidence in the light most favorable to the government. *See United States v. Brown*, 200 F.3d 700, 704 (10th Cir. 1999). We reverse only if no rational jury could have found each element of the crime beyond a reasonable doubt. *See id.* "We must not weigh conflicting evidence or consider the credibility of the witnesses, but simply determine whether the evidence, if believed, would establish each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (quotation marks and alteration omitted).

Under this standard, the evidence is sufficient to support Mr. Parada's conviction. To support a conviction for possession with intent to distribute, the government must establish the defendant (1) knowingly possessed the controlled substance and (2) possessed it with the intent to distribute. *See United States v. Carter,* 130 F.3d 1432, 1440 (10th Cir. 1997).[8] "To prove conspiracy, the

_____

[8] "The possession of the controlled substance may be actual or
(continued...)

government must show: (1) two or more people agreed to violate the law, (2) the defendant knew at least the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily became a part of it, and (4) the alleged co-conspirators were interdependent." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005).

Based on the evidence introduced at trial, considered in the light most favorable to the government, the jury reasonably could have concluded that Mr. Parada both possessed PCP with intent to distribute and conspired to possess PCP with intent to distribute. Mr. Parada was found in the vehicle with a very large quantity of PCP – valued at $448,000 – together with his co-conspirators. The government introduced evidence at trial showing Mr. Parada planned the cross-country trip, purchased the cooler in which the PCP was stored, met the alleged supplier to receive the drugs, indicated knowledge of the cooler's contents, devised a cover-up story following the group's apprehension, and complained about the amount of money he lost when the police seized the drugs.

Mr. Parada disputes the credibility of Bradley, the government's chief witness, but as we have explained, "reassess[ing] and reweigh[ing] the testimony" of a witness would be in "contravention of this court's [prior] rulings." *United*

---

[8](...continued)
constructive. Constructive possession may be established by circumstantial evidence and may be joint among several individuals." *United States v. McKissick*, 304 F.3d 1282, 1291 (10th Cir. 2000) (quotation marks omitted).

*States v. McIntyre*, 997 F.2d 687, 708 (10th Cir. 1993). Moreover, "the uncorroborated testimony of a co-conspirator, so long as it is not incredible or unsubstantial, is sufficient evidence on which to base a conviction." *Id.*[9] We hold the evidence is sufficient to support Mr. Parada's conviction.

For the foregoing reasons, we **AFFIRM** Mr. Parada's conviction.

---

[9] The cases upon which Mr. Parada relies are factually distinguishable. In *United States v. Riggins*, 15 F.3d 992, 994 (10th Cir. 1994), where we held the evidence insufficient to support the conviction, the only evidence supporting the conspiracy conviction was the defendant's presence in the van where narcotics were found and the gifts she had previously received from her mother, an alleged co-conspirator with a history of previous arrests. Likewise, in *United States v. Anderson*, 981 F.2d 1560, 1564-65 (10th Cir. 1995), the conspiracy conviction was based on an isolated transaction involving a small quantity of drugs, and there was no testimony from an informant, undercover agent, or co-conspirator regarding the defendant's involvement in the conspiracy.