COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judge AtLee and Senior Judge Humphreys
Argued by videoconference


TECQUIN DARKEEM MOORE, S/K/A
 TECQUIN DAKEEM MOORE
                                                             OPINION BY
v.      Record No. 0715-24-3               CHIEF JUDGE MARLA GRAFF DECKER
                                                          AUGUST 26, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge[1]

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Tecquin Darkeem Moore appeals his convictions for four counts of possessing various

scheduled drugs with intent to distribute and one count of obstructing a law enforcement officer

in the performance of his duties in violation of Code §§ 18.2-248 and -460(A).[2]  He entered

conditional pleas of guilty to those offenses after the circuit court denied his motion to suppress

evidence.  Moore argues that the denial of the motion to suppress was error.  He points to the

failure of the drug-sniffing canine to formally "alert" to the presence of drugs in his car, and he

contends that absent such a specific signal, the search was not supported by probable cause.

---

[1] Judge James J. Reynolds ruled on the suppression motion.  Judge Milam accepted the
conditional guilty pleas and sentenced Moore.

[2] Three of the drug convictions were for possessing a Schedule I or II drug with intent to
distribute after having previously been convicted of a like offense in violation of Code
§ 18.2-248(C).  One conviction was for possessing a Schedule IV drug with intent to distribute in
violation of Code § 18.2-248(E)(2).

Resolving a question of first impression in Virginia, we hold that a law-enforcement handler's testimony about his drug dog's nontrained behavioral changes, accepted as credible by the circuit court, can provide probable cause for a search. Accordingly, the Court affirms Moore's convictions.[3]

BACKGROUND[4]

On the afternoon of April 29, 2022, a person who was under surveillance by the Danville Police Department for possible drug trafficking met with an occupant of a Dodge Charger. Investigator D.C. Lancaster then surveilled the Charger and learned through the car's license plate number that it was registered to Moore. He also determined that Moore had a "criminal history."[5]

Driving an unmarked car, Investigator Lancaster watched the Charger drive through a gas-station parking lot. Before pulling back onto the street, the Charger's driver did not bring it to a complete stop. Lancaster notified Officer J.A. Ferguson, who was driving a marked police

---

[3] Following sentencing, the circuit court denied Moore's motion for post-trial bail pending appeal, as well as his renewed motion. Moore challenged that ruling in this Court and asked this Court to set bond pending appeal. In an unpublished order, this Court rejected that challenge to the trial court's ruling and denied the request for bond pending appeal. *See Moore v. Commonwealth*, No. 0715-24-3 (Va. Ct. App. June 27, 2024). Now, in a second assignment of error in his brief, Moore asks this Court to reconsider those rulings. Although opening with the standard of review, he does not cite the controlling statute or analyze any case law interpreting and applying it. We hold that Moore's argument is waived due to his failure to provide the Court with the substantive legal framework through which to evaluate this assignment of error. *See* Rule 5A:20(e); *Bartley v. Commonwealth*, 67 Va. App. 740, 746 (2017), *cited with approval in Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018).

[4] "On appeal from a denial of a suppression motion, [the appellate court] view[s] 'the facts in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences [flowing from the evidence].'" *Curley v. Commonwealth*, 295 Va. 616, 618 (2018) (quoting *Evans v. Commonwealth*, 290 Va. 277, 280 (2015)).

[5] The Commonwealth offered no evidence about the nature of that criminal history or which law enforcement officers other than Lancaster were aware of it.

vehicle, and Ferguson pulled the Charger over for the misdemeanor traffic offense. Moore was the car's driver.[6]

About a minute after the officer made the traffic stop, Deputy Matthew Reynolds of the Pittsylvania County Sheriff's Department arrived with his drug dog Caroline, who was trained to detect the odors of methamphetamine, heroin, and cocaine. Reynolds "r[a]n" the dog around the Charger twice. Both of the car's front windows were down, the motor was off, and two people were inside.

Deputy Reynolds did not see Caroline give a trained "final response" to indicate that she had detected the precise location of methamphetamine, heroin, or cocaine in the Charger. But he observed "non[]trained behavioral changes" indicating that she had detected the odor of at least one of those drugs coming from the car. Reynolds told an officer at the scene that Caroline's behavior supported a search of the car. In the "'sunglasses compartment' high up" in "the center of the [car]," the officers found several drugs, including methamphetamine and cocaine.[7]

Moore was indicted for four drug offenses involving his possession of methamphetamine, cocaine, fentanyl, and alprazolam with intent to distribute, three of which were repeat offenses, as well as for obstructing a law enforcement officer in the performance of his duties. Following discovery, Moore made a motion to suppress the drugs, as well as his later statements. He alleged that the officers lacked probable cause for the search under the United States and

---

[6] Moore does not challenge the traffic stop.

[7] The fact that contraband was found during a search is not appropriate to consider in assessing whether police had probable cause to search in the first instance. *See Slayton v. Commonwealth*, 41 Va. App. 101, 108 n.1 (2003). Here, defense counsel originally objected to the admission of the testimony that the officers found drugs in the car. He abandoned that objection, though, and the court considered the evidence only as a possible explanation for why Caroline was able to detect the odor of drugs but unable to give a trained "final response" signaling their precise location.

Virginia Constitutions because "the drug dog did not in fact alert to [the presence of] drugs" in the car.

At the suppression hearing, Deputy Reynolds provided extensive testimony about his own canine drug-detection training and that of his drug dog Caroline, as well as information about her performance, both during training and in the field. He explained that he had been a certified dog handler since 2016 and his training taught him, among other things, to understand canine responses. Reynolds initially trained with Caroline for two weeks. Subsequent maintenance training involved at least eight hours twice each month, as well as one week of training annually. When Caroline conducted her "sniff" of Moore's car, Reynolds had worked with her for nine months.

Both Deputy Reynolds and Caroline were certified annually through a national and state organization. The annual certification process required Caroline to examine five to seven vehicles in a controlled environment and to identify which vehicles contained drugs and which ones did not. Reynolds explained that the dog had to perform "perfect[ly]" on her annual certification test. Even a single false positive would cause her to fail the test.[8]

The deputy testified that he used two different terms to describe Caroline's relevant behavior when she detected drugs—trained "final response" and "non[]trained behavioral change[]." He explained that he used these terms instead of "alert" because the term "alert" could be overly broad and confusing. A trained "final response" described the way Caroline was taught to identify the specific source of the odor of drugs. Caroline's trained final response was "a freeze or sit . . . depend[ing] on how high" and "how close" the source of the odor was from

_____

[8] Reynolds noted that a dog is not penalized for false responses "in the field" because the dog responds to the odor of the drugs and, in that context, can detect the odor even if drugs are no longer present.

- 4 -

her location. Consistent with her training, the dog received a reward each time she correctly identified the source of the odor of drugs using her final response.

Deputy Reynolds elaborated on the nontrained behavioral changes that drug-sniffing dogs can exhibit while searching for drugs, as well as his own training about the significance of those behaviors and Caroline's displays of them. He explained that when a dog exhibits nontrained behavioral changes but does not provide a final response, it is because the dog is "not within [a] certain threshold [distance] of . . . [specifically] where [the odor i]s coming from." He testified without objection that after the search, he was told that the drugs in Moore's Charger were found in the car's "sunglass holder." He inferred that the holder was in the center or the top of the car, "a long way[]" from Caroline's position outside it, making it more difficult for her to pinpoint the precise location of the drugs in the car.

Reynolds also testified about several different nontrained behavioral changes that signify a dog's detection of the odor of drugs. He pointed to breathing changes, during which "the dog breathes rapidly [and] heavily" to "pull as much of that odor . . . through [its] nose" as possible while trying to pinpoint the source. He noted another nontrained behavioral change involving a dog's rapid turn of its head and change in posture. He explained that these movements indicate the dog has smelled drugs and is "try[ing] to stay in the odor," to find the drugs and get the reward.[9]

Reynolds said that his initial two weeks of training with Caroline permitted him to learn the specific behavioral changes she exhibited "when . . . [in] an odor and when . . . not [in] an odor." And he explained that someone not specifically trained as a handler, including other law

---

[9] Other movements Deputy Reynolds described were a dog's "intensi[fying its] search," jumping up on a car, "trying to check underneath" it, and "wag[ging] its tail . . . intensely."

enforcement officers, "[g]enerally[] would not recognize" a drug dog's nontrained behavioral changes.

Reynolds confirmed that canine behavior "other than a final response" can indicate the dog's detection of the odor of drugs. He detailed that his canine-handler training provided that three nontrained behavioral changes reliably signal the dog has smelled drugs. He explicitly noted that, when training in controlled environments, Caroline had on multiple occasions displayed her discovery of the odor of drugs by showing *only* nontrained behavioral changes. He added that Caroline had never exhibited nontrained behavioral changes during training when drugs were not present in a car. Additionally, the deputy noted instances in which he ran Caroline around cars in the field and she "[did] not respond[]" at all. After being qualified as an expert, he opined that Caroline's reliability in detecting the odor of drugs was "[one] hundred percent."

Reynolds testified specifically about the three nontrained behavioral responses that Caroline exhibited during her sniff of Moore's car—"a rapid breathing change at the front of the vehicle in the first pass," the same thing during the second pass, and "a head turn" at the back door on the driver's side. He confirmed, based on his training and experience with Caroline, that those three actions, viewed together, showed that she detected the odor of methamphetamine, cocaine, or heroin coming from the car.

Deputy Reynolds kept records of Caroline's performance both in training and in the field, and some of those records were admitted into evidence. The prosecutor focused on eight specific records from training exercises between July 2021 and April 2022, all before Caroline's examination of Moore's car. Those training records showed instances when Caroline accurately confirmed the presence of drugs through multiple nontrained behavioral changes unaccompanied

- 6 -

by a final response. Reynolds confirmed that Caroline never incorrectly indicated drugs were present in any of those training sessions.

The circuit court issued a letter opinion denying the motion to suppress. It ruled that the search was supported by probable cause based on the "credible" testimony of Deputy Reynolds, Caroline's "training documents," and "the body camera footage of the incident." The court noted that the deputy and Caroline were "trained, certified, and established as a reliable search team." And it concluded that the time Reynolds spent with the dog "in training, on duty, and off duty [wa]s sufficient for him to interpret her behavior." The court also found no evidence of any motivation for Deputy Reynolds to "skew[]" his testimony "in violation of his oath." Finally, it ruled that "[a]lthough Caroline did not render a final 'indication,' the behaviors observed and testified to by Deputy Reynolds—which [we]re consistent with the body camera footage[—]showed a 'fair probability that contraband . . . w[ould] be found' in the vehicle. *See Illinois v. Gates*, 462 U.S. 213 (1983)." The court pointed out that two of the drugs found were "consistent with what Caroline [wa]s trained to detect." It opined that "the location of the drugs . . . in a 'sunglasses compartment' high up in the vehicle was consistent with [Caroline's] behavior observed based on Deputy Reynolds'[s] training."

In response to the court's denial of the motion to suppress, Moore entered conditional guilty pleas. The court sentenced him to thirty years and twelve months in prison with fifteen years and twelve months suspended.

ANALYSIS

Moore challenges the circuit court's denial of his motion to suppress. He limits his challenge to a specific point, arguing that the police lacked probable cause to search his car absent a formal, trained canine alert.

## I. Standard of Review

On review of a circuit court's decision denying a motion to suppress, the appellate court "determine[s] whether the accused has met his burden to show that the [lower] court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error." *Knight v. Commonwealth*, 71 Va. App. 771, 782 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)). "This Court is 'bound by the [circuit] court's findings of historical fact unless plainly wrong or without evidence to support them.'" *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (quoting *Williams v. Commonwealth*, 71 Va. App. 462, 475 (2020)). One such category of factual findings to which the appellate court must defer is the credibility of witnesses. *Knight*, 71 Va. App. at 785-86. And whether a drug dog's behavior signaled that it detected the odor of drugs emanating from a car, as well as the reliability of that signal, are likewise questions of fact entitled to deference on appeal. *See United States v. Mason*, 628 F.3d 123, 130 (4th Cir. 2010) (signal); *United States v. Martinez*, 102 F.4th 677, 683 (5th Cir. 2024) (reliability); *United States v. Gregory*, 302 F.3d 805, 811 (8th Cir. 2002) (signal and reliability); *cf. Jones v. Commonwealth*, 277 Va. 171, 179 (2009) (providing that evaluating the reliability of a dog sniff is akin to assessing information from an informant); *Byrd v. Commonwealth*, 50 Va. App. 542, 552 (2007) (holding that the circuit court's determination of an informant's reliability is a finding of fact). But the significance of those facts in light of "Fourth Amendment jurisprudence . . . is a question of law . . . review[ed] de novo." *Durham v. Commonwealth*, ___ Va. ___, ___ (Aug. 1, 2024).[10]

---

[10] A defendant's rights under the Fourth Amendment "are co-extensive with those rights afforded under Article 1, Section 10 of the Constitution of Virginia." *Sidney v. Commonwealth*, 280 Va. 517, 520 n.* (2010). So "we include [our analysis of Moore's challenge concerning his] state constitutional rights in our discussion of his federal constitutional rights." *See id.*

## II. Probable Cause and Canine Alerts

Moore contends that the evidence failed to establish the drug dog alerted to signal the presence of illegal drugs in his car. He posits that the term "alert" equates to Deputy Reynolds's term "trained 'final response.'" And he argues that the probable-cause standard was not met here because Reynolds's drug dog Caroline did not provide a "trained 'final response.'"[11]

Our analysis begins with some basic legal principles. Under the Fourth Amendment's longstanding automobile exception, law enforcement officers, "[b]efore making an arrest and without obtaining a search warrant, . . . may search a vehicle when they have probable cause to believe that the vehicle contains evidence of a crime." *Id.* at ___; *see Curley v. Commonwealth*, 295 Va. 616, 621 (2018). The law recognizes that "probable cause may be supported by the detection of distinctive odors." *Bunch v. Commonwealth*, 51 Va. App. 491, 496 (2008) (quoting *United States v. Haynie*, 637 F.2d 227, 234 (4th Cir. 1980)). And those odors may be identified by a trained canine. *Jones*, 277 Va. at 178 ("[T]he use of a well-trained narcotics-detection dog . . . during a lawful traffic stop[] generally does not implicate legitimate privacy interests." (quoting *Illinois v. Caballes*, 543 U.S. 405, 409 (2005))). In fact, under appropriate circumstances, a trained dog's "positive alert" can provide probable cause to search a motor vehicle. *See id.* at 180. So we turn to the definition of probable cause and the relationship between probable cause and dog sniffs.

Probable cause "is a 'flexible, common-sense standard.'" *Keene v. Commonwealth*, 74 Va. App. 547, 555 (2022) (quoting *Slayton v. Commonwealth*, 41 Va. App. 101, 106 (2003)). "Unlike a factfinder at trial, 'reasonable [police] officers need not "resolve every doubt . . . before probable cause is established."'" *Joyce v. Commonwealth*, 56 Va. App. 646, 660 (2010)

---

[11] Moore expressly does not contest "the officer's expertise" or "Caroline's ability to alert to the stated drugs."

(quoting *Slayton*, 41 Va. App. at 107). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Gates*, 462 U.S. at 244 n.13). In short, probable cause to search a particular place "exists when 'there is a fair probability that contraband or evidence of a crime will be found in [that] place.'" *Jones*, 277 Va. at 178 (quoting *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). Of course, in determining whether probable cause exists, courts look to the totality of the circumstances. *Gates*, 462 U.S. at 238; *see Durham*, ___ Va. at ___. Those circumstances, although viewed objectively, allow officers to draw on their "training, experience, and everyday common sense." *Durham*, ___ Va. at ___; *see Curley*, 295 Va. at 622.

In *Florida v. Harris*, 568 U.S. 237, 240 (2013), the United States Supreme Court referred to a drug canine's act of "alert[ing]" toward a particular spot or location as "signaling, through a distinctive set of behaviors, that [the dog] smelled drugs there." The Court also made clear that the totality-of-the-circumstances standard governing probable cause determinations in general encompasses dog-sniff assessments and provides the appropriate framework for the analysis in such circumstances. *Id.* at 244. And that standard specifically "reject[s] rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" to determining whether police had probable cause for a search. *Id.* Viewed through this lens, the Supreme Court's definition of alert in *Harris*—a dog's "signaling" through "distinctive . . . behaviors" that it "smelled drugs" in a particular location, *id.* at 240—is a broad one. And we hold that it is broad enough to permit the dog's signaling to occur through *either* a trained final response *or* a series of nontrained behavioral changes.[12]

---

[12] The term "nontrained" should not be misconstrued. The behavior is nontrained to the extent that it is not a display of the specific final response that the dog has been trained to provide when it pinpoints the odor of certain drugs. But behavioral changes short of a final response are nonetheless trained to the extent that the dog is taught to seek out the particular

Similar to assessing information provided by an informant, the court should consider several key factors in evaluating dog-alert testimony. These factors include the "training and reliability of the dog in the detection of specific drugs by odor," "the witness handler's expertise in interpreting the dog's behavior," the "circumstances conducive to a dependable scent identification by the animal," and "a credible evaluation" of the dog's behavior by the handler. *Jones*, 277 Va. at 180 (quoting *Hetmeyer v. Commonwealth*, 19 Va. App. 103, 109-10 (1994)). In other words, the distinctive set of behaviors that constitute a drug dog's means of signaling to its handler that the dog smelled drugs may vary based on the characteristics of the particular dog, the particular handler, and the specific training of both. *See id.* And these factors are to be viewed in the context of the particular case. *See Gates*, 462 U.S. at 238.

"[A] probable-cause hearing focusing on a dog's alert should proceed much like any other" such hearing, permitting "the parties to make their best case, consistent with the usual rules of criminal procedure." *Harris*, 568 U.S. at 247. According to the United States Supreme Court, "[i]f the [Commonwealth] has produced proof *from controlled settings* that a dog performs reliably in detecting drugs[] and the defendant has not contested that showing, then the court should [conclude that officers had] probable cause." *Id.* at 248 (emphasis added).[13] The

---

odor, motivated by the reward received if it does provide an accurate final response pinpointing the specific source of the drug odor.

[13] The Supreme Court specifically rejected the notion that the government was required to provide complete "documentation of the dog's prior 'hits' and 'misses' *in the field*." *Harris*, 568 U.S. at 245 (emphasis added). It recognized that, in the field, a dog may "alert[] to a car in which the officer finds no narcotics" due not to a "mistake" by the dog but because it "detected substances . . . too well hidden or present in quantities too small for the officer to locate" or simply because the dog "smelled the residual odor of drugs." *Id.* at 245. The Court explained that "[i]n the usual case, the mere chance that the substance might no longer be at the location [because the dog detected a residual odor] does not matter[. A] well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found." *Id.* at 246 n.2. Notably, the Court also held that "a dog's satisfactory performance in a certification or training program," standing alone, can

Court reasoned, by contrast, that if the defendant "challenge[s] the [Commonwealth]'s case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence." *Id.* But it emphasized that "[i]n all events, the court should not prescribe . . . an inflexible set of evidentiary requirements." *Id.* Instead, "[t]he question— similar to every inquiry into probable cause—is whether all the facts surrounding [the] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband." *Id.* The Court concluded that "[a dog] sniff is up to snuff when it meets that test." *Id.* Its decision in *Harris* drives home the point that in the case of a canine drug sniff, just as in all other contexts, probable cause is "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 244 (quoting *Gates*, 462 U.S. at 232).

### III. Canine Caroline's Training and Behavior

We now apply the law to the facts at hand. The evidence here, similar to the evidence in *Harris*, supports the circuit court's finding that (1) Deputy Reynolds, who was trained and certified, gave credible testimony and (2) Caroline, also trained and certified, engaged in a display of distinctive nontrained behavioral changes sufficient to provide Deputy Reynolds with probable cause to believe that she detected the odor of illegal drugs in Moore's car. Certainly in some cases, behavior less than a final response may not support a finding of probable cause. But in the instant case, and in light of the circuit court's acceptance of the deputy's testimony as credible, the record contains more than enough evidence of Caroline's reliability in detecting the odor of drugs under similar circumstances—based on multiple nontrained behavioral changes rather than a single final response—to provide the requisite probable cause for a search.

---

"provide sufficient reason to trust [its] alert." *Id.* at 246; *see id.* at 247 (recognizing that this inference can apply "even [without] formal certification"); *Jones*, 277 Va. at 180-81 (same).

The evidence established that Caroline was a certified narcotics dog, trained to detect the odors of methamphetamine, cocaine, and heroin, and Deputy Reynolds was her certified handler. Reynolds was Caroline's only handler and trained with her for two weeks when his department initially acquired her. He worked with her for nine months before her sniff of Moore's car. During that time, Reynolds and Caroline engaged in sixteen hours of monthly maintenance training and also attended an annual one-week training workshop. Reynolds explained to the court that the dog performed "perfect[ly]" on her annual certification test. Testifying as an expert, Reynolds opined that Caroline's accuracy rate in detecting the odor of drugs was 100%.

According to Deputy Reynolds, he did not use the term "alert" to describe Caroline's behavior when she located the odor of drugs because that term could be overly broad and confusing. Instead, he used the term "final response" to refer to Caroline's *trained* method of signaling that she had smelled one or more of the specific drugs she was trained to find. He described Caroline's *trained* behavior conveying her final response as involving her "freez[ing] or sit[ting]," depending on how high or how close the odor was. Yet that was not the only way Caroline's behavior signaled that she detected drugs. Reynolds emphasized that she could reliably smell the odor of one or more of those drugs but not provide a final response if she was "not within [a] certain threshold [distance] of . . . [specifically] where [the odor wa]s coming from."

Deputy Reynolds elaborated on how Caroline's behavior short of a trained final response could reliably signal her detection of the odor of one or more drugs. Reynolds explained that drug dogs like Caroline exhibit "*non[ ]trained* behavioral changes" when they first detect the odor of drugs they are trained to find. (Emphasis added). He noted that his training as a certified drug-dog handler taught him that three specific *nontrained* behavioral changes while circling a target indicate the dog has detected the odor of drugs.

- 13 -

Reynolds referenced two different *categories* from which the three nontrained behavioral changes could be drawn—changes in breathing and changes in posture. He described breathing changes as "when the dog breathes rapidly [and] heavily," indicating it has detected the odor and is trying to pinpoint its source. With regard to postural changes, he noted the dog's quick turn of its head toward the car while "try[ing] to stay in the odor." Both movements indicate the dog has detected the odor of drugs and wants to find them and get the reward.

Importantly here, Reynolds testified about Caroline's accuracy in signaling the presence of drugs during her training sessions through these nontrained behavioral changes. He identified eight sessions in the nine months preceding Caroline's sniff of Moore's Charger in which she accurately signaled the presence of drugs by exhibiting three or more nontrained behavioral changes. The specific records from each of the training sessions documenting those results were introduced into evidence. Reynolds also testified that when training in controlled environments, Caroline had never exhibited nontrained behavioral changes when drugs were not present in a car.[14]

Finally, Deputy Reynolds described the three nontrained behavioral changes he observed in Caroline: "a rapid breathing change" at the front of the Charger during *each* of her two circuits around the car, counting as two changes, as well as a "a head turn" at the rear driver's-side door, which qualified as the third change. He confirmed that those three changes, viewed together, based on his training and experience with Caroline, showed that she detected the odor of methamphetamine, cocaine, or heroin coming from the car.[15]

---

[14] He also confirmed that there were instances in the field when he ran her around cars and she "ha[d] not responded" at all, even with nontrained behavioral changes, tending to prove that she did not provide false-positive indications.

[15] Without objection, Reynolds explained Caroline's failure to provide a final response that day by the fact that the drugs in Moore's Charger were found in the car's "sunglass holder," "a long way[]" from her position outside the vehicle.

The circuit court found that Deputy Reynolds's testimony was both credible and consistent with the body-worn camera footage. *See Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (recognizing that the deference owed to the circuit court's findings of fact applies to both its assessment of "'witness credibility' [and its] 'interpretation of . . . video evidence'" (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022))). The court also found that the deputy's testimony and Caroline's training documents established that they were "a reliable search team" despite the absence of a trained "final 'indication'" from the dog. *See Harris*, 568 U.S. at 248; *Jones*, 277 Va. at 180-81. As a result, based on the totality of the circumstances, the circuit court held that the officers had probable cause to search the Charger. These factual findings were not plainly wrong, and they support the circuit court's ultimate ruling that the officers had probable cause for the search. So the court did not err by denying the motion to suppress.[16]

---

[16] Rulings in other jurisdictions support the conclusion that in light of *Harris*, a drug dog's "alert" need not be a trained "final response" or other trained signal to provide probable cause to search for drugs. *See State v. Ricks*, 539 P.3d 190, 195 (Idaho Ct. App. 2023) ("Like courts in other jurisdictions, we conclude a dog's signaling behavior of a general alert—such as the dog's breathing, posture, body movements, and verbal responses—can constitute probable cause."); *Steck v. State*, 197 A.3d 531, 536, 544 (Md. Ct. Spec. App. 2018) (concluding that requiring a dog to "provide a trained, final alert . . . for probable cause to exist" is neither "practical nor in accord with Fourth Amendment jurisprudence"); *see also United States v. Braddy*, 11 F.4th 1298, 1313-15 (11th Cir. 2021) (applying *Harris*'s rejection of a "'strict evidentiary checklist' for assessing whether a drug detection dog is sufficiently reliable" and crediting the handler's testimony that his dog's nontrained responses established the presence of drugs (first quoting *Harris*, 568 U.S. at 244; then citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009); and then citing *United States v. Thomas*, 726 F.3d 1086, 1098 (9th Cir. 2013))); *United States v. Holleman*, 743 F.3d 1152, 1156-58 (8th Cir. 2014) (applying *Harris* to hold that the dog's "failure to give a full indication" did not prevent a determination of probable cause in a case involving factors in addition to the canine sniff); *United States v. Curry*, 478 F. App'x 42, 44 (4th Cir. 2012) (per curiam) (unpublished) (holding that "a 'general alert'" is adequate to establish probable cause to search and "a pinpoint indication of the location of the drugs" is not needed (quoting *Parada*, 577 F.3d at 1282)); *United States v. Shen*, 749 F. App'x 256, 261 (5th Cir. 2018) (per curiam) (unpublished) (noting an absence of Fifth Circuit law requiring "a full and final alert" and relying on *Harris* to credit the handler's testimony about the dog's nontrained behavior).

CONCLUSION

The circuit court did not err by holding that the deputy's testimony about his trained canine's behavior provided sufficient evidence to establish probable cause to search Moore's car. Consequently, the denial of his motion to suppress was not error, and we affirm his convictions.

*Affirmed.*